Jennifer J. Middleton, OSB # 071510
jmiddleton@justicelawyers.com
Meredith Holley, OSB # 125647
mholley@justicelawyers.com
JOHNSON, JOHNSON & SCHALLER, PC
975 Oak Street, Suite 1050
Eugene, OR 97401-3124
Phone: 541/683-2506
Fax:    541/484-0882
     Attorneys for Plaintiff Robert Louis Dannenhoffer, MD

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
EUGENE DIVISION

| | |
|---|---|
| ROBERT LOUIS DANNENHOFFER, M.D., | Case No.  6:16-cv-0135 |
| Plaintiff, | COMPLAINT |
| vs. | 31 U.S.C.A. § 3730(h); ORS 659A.199; ORS 659.805; Intentional Interference with Business Relations |
| ARCHITRAVE HEALTH, LLC; MERCY MEDICAL CENTER, INC. | |
| Defendants. | *Demand for Jury Trial* |

INTRODUCTORY STATEMENT

1.

    Defendant Architrave Health, LLC, summarily fired its Chief Executive Officer, plaintiff Dr. Robert Dannenhoffer, after he reported to the federal government illegal payments to doctors totaling over $10 million that had been going on for years at Architrave's subsidiary, Umpqua Medical Group. The payments violated federal health care laws. Those laws are designed to protect patients and taxpayers by reducing incentives for doctors to order unnecessary tests and procedures, or to refer patients to health care facilities, in exchange for improper benefits or kickbacks. This case challenges Architrave Health, LLC's illegal discharge of Dr. Dannenhoffer

for blowing the whistle on millions of dollars in fraudulent claims to Medicare and Medicaid and

taking other steps to stop illegal kickbacks and doctor self-referrals in Douglas County.

### JURISDICTION & VENUE

2.

This matter arises under 31 U.S.C. § 3730(h), the anti-retaliation provision of the federal

False Claims Act. Jurisdiction is proper under 31 U.S.C. § 3730(h)(2) and 28 U.S.C. § 1331.

Supplemental jurisdiction over related state law claims is proper under 28 U.S.C. § 1367.

3.

The events underlying Dr. Dannenhoffer's claims took place in Douglas County, Oregon,

making venue proper in the District of Oregon, Eugene Division.

### PARTIES

4.

Plaintiff Dr. Robert Dannenhoffer is a pediatrician and resident of Douglas County,

Oregon. He is the former Chief Executive Officer of defendant Architrave Health, LLC. He is a

former President of the Oregon Medical Association, has held numerous positions on statewide

committees and task forces addressing health care reform, and is widely respected as an

innovative health reformer in the state.

5.

Defendant Architrave Health, LLC (Architrave) is a member-managed LLC located in

Roseburg, Oregon, and formed in 2013. It is a joint venture between Mercy Medical Center, Inc.

and the Douglas County doctors' corporation, the Douglas County Independent Practice

Association, Inc. (DCIPA, Inc.). Mercy and DCIPA, Inc. are the sole members and managers of

Architrave.

6.

Mercy Medical Center, Inc. (Mercy or MMC) is a domestic nonprofit corporation that

owns and operates a 174-bed community hospital in Roseburg.  Mercy is in turn owned by

Catholic Health Initiatives.

7.

The Douglas County Independent Practice Association, Inc. (DCIPA, Inc.) is a physician-owned corporation with approximately 105 doctor-owners in Roseburg. Prior to the formation of Architrave, DCIPA, Inc. owned and operated various subsidiaries including clinics and medical groups. These holdings generated substantial income for DCIPA, Inc. and its doctor-owners.

## LEGAL BACKGROUND:
### THE STARK LAW, THE ANTI-KICKBACK ACT, AND THE FALSE CLAIMS ACT

8.

The goal of federal Stark Amendment to the Medicare statute, 42 U.S.C. § 1395nn, is to reduce losses to Medicare. It bars submission to Medicare of claims for designated health services when the doctors prescribing the services profit directly from those services or tests. By barring such payments, the law seeks to reduce financial incentives for doctors to order unnecessary health services to the detriment of patients at the expense of the federal government.

9.

The Stark Amendment establishes a clear rule that the United States will not pay for designated health services prescribed by doctors who have improper financial relationships with the provider of the service. Specifically, the Stark law prohibits a hospital or other entity providing certain "designated health services" (defined at 42 U.S.C. § 1395nn(h)(6)) from submitting to Medicare claims for those services that are based on referrals from physicians who have a "financial relationship" (defined at 42 U.S.C. § 1395nn(h)(1)) with the entity, unless a statutory exception applies. The Stark Law likewise prohibits Medicare from paying such claims.

10.

Stark is a strict liability statute, requiring no showing of intent. Its regulations expressly require that any entity collecting payment for a healthcare service "performed pursuant to a prohibited referral must refund all collected amounts on a timely basis." 42 C.F.R. § 411.353. The law's prohibitions also apply to claims for services under Medicaid. 42 U.S.C. § 1396b(s).

11.

Financial relationships that give rise to the Stark law's prohibition include a "compensation arrangement," meaning any arrangement involving any remuneration paid directly or indirectly to a referring physician, absent an exception. 42 U.S.C. §§ 1395nn(h)(1)(A) and (h)(1)(B).

12.

The False Claims Act, 31 U.S.C. § 3729, is a federal law designed to combat fraud against the U.S. government. Claims to the federal government for payment that violate the Stark law are false claims within the meaning of the False Claims Act.

13.

The Anti-Kickback Act, 42 U.S.C. § 1320a-7b(b), prohibits anyone from knowingly and willfully paying, or offering to pay, any remuneration directly or indirectly in return for a referral for a Medicare-or-Medicaid-covered service or good, absent an exception. Violation can carry a criminal felony and also can disqualify the provider from participation in Medicare or Medicaid.

14.

Claims for payment by the federal government for medical goods or services that result from remuneration prohibited under the Anti-Kickback Act are false claims within the meaning of the False Claims Act, 31 U.S.C. § 3729. 42 U.S.C § 1320a-7b(g).

## FACTUAL ALLEGATIONS

## I.    MERCY MEDICAL CENTER AND DCIPA, INC. FORM ARCHITRAVE

15.

Plaintiff Dr. Dannenhoffer spearheaded the formation of Architrave in 2012. The concept behind Architrave was to bring the local community hospital (Mercy) and the doctors' corporation (DCIPA, Inc.) together in a joint venture that would align their interests and promote access to high-quality, low-cost health care for the residents of Douglas County.

16.

To form Architrave, Mercy put up $23 million in capital and DCIPA, Inc. transferred to Architrave the majority of its assets. Those assets included DCIPA, LLC, which does business under the name of the Umpqua Health Alliance and is the Coordinated Care Organization for Douglas County; Umpqua Medical Group; a medical billing company called PCBS (Physician Coding and Billing Service); Physician eHealth Services, which manages electronic health records; Umpqua Regional Medical Center; and a one-third interest in ATRIO Health Plans, a Medicare Advantage plan. A portion of the $23 million capital contribution went to pay the doctor-owners of DCIPA a dividend of up to $280,000 for the shares they held in DCIPA, Inc.

17.

Plaintiff Dr. Dannenhoffer was CEO of DCIPA when he and other leaders of DCIPA and Mercy conceived of and formed Architrave. Architrave's founders invited Dr. Dannenhoffer to become CEO of Architrave when it began operations on January 1, 2013, and he accepted.

18.

As CEO of Architrave, Dr. Dannenhoffer was accountable to its two member-managers, Mercy and DCIPA, Inc. Architrave had a ten-member board of directors made up of five representatives of DCIPA, Inc. and five representatives from Mercy.

19.

Over Architrave's first two years in business under Dr. Dannenhoffer's leadership, it generated substantial earnings while spearheading an innovative and efficient model of health service delivery for low-income residents of Douglas County, especially members of the Oregon Health Plan (OHP). Architrave opened a special, high intensity clinic for patients with severe mental and medical illness, for example, and undertook a population health initiative to better meet the performance metrics of the OHP.

II.    DR. DANNENHOFFER PULLS ARCHITRAVE OUT OF PROHIBITED TRANSACTIONS

20.

Kelly Morgan is the CEO of Mercy Medical Center and the Chairman of Architrave's Board of Directors.

21.

One of Mercy CEO Morgan's top goals is to "reduce outmigration" of patients in the Roseburg area to specialists and hospitals in Eugene and other larger cities.

22.

Because Mercy is the primary community hospital in the Roseburg and Douglas County area, reducing outmigration effectively means that doctors increase their referrals of patients to Mercy for treatment.

23.

After Architrave was formed, DCIPA, Inc. no longer owned assets that generated ongoing cash income for the company. DCIPA, Inc. continued to have cash flow needs, however, including salaries for its new CEO, Dr. Larry Sharp, and for its Chief Financial Officer, Chuck Chappell; administrative staff; office space; money for its Political Action Committee, which made contributions to Oregon politicians; and funding for events and benefits for doctors.

24.

Through transactions described below, Mercy CEO Morgan and DCIPA, Inc. CEO Sharp used Architrave as a vehicle through which they could funnel cash to DCIPA, Inc. to fund its budget. DCIPA, Inc., in turn, worked closely with Morgan to "reduce outmigration." By ensuring that DCIPA, Inc., had money to fund its budget, its PAC and its activities, Mercy secured the cooperation of DCIPA, Inc. and its doctor-members to keep patient referrals in Roseburg and going to Mercy.

A.    **The No-Services Consulting Contract**

25.

Around December, 2012, just before Architrave's formal start of business on January 1, 2013, Morgan and Sharp told Dr. Dannenhoffer that Architrave should enter a $360,000 annual consulting agreement with DCIPA, Inc.

26.

Morgan insisted that such an agreement was typical after a deal like the one they made to form Architrave, and that no legal review was required for the contract. No scope of work was described and no fair market value analysis conducted.

27.

As the year passed, DCIPA, Inc. provided no consulting services. Dr. Dannenhoffer raised concerns numerous times with Morgan and Sharp. He pleaded with DCIPA, Inc. to give him something that he could call "consulting" under the contract to have a plausible claim that it carried some value for Architrave.

28.

DCIPA, Inc. provided no identifiable consulting services under the contract.

29.

Morgan and Sharp pressed Dr. Dannenhoffer to renew the payments for 2014. Dr. Dannenhoffer was not willing to continue paying DCIPA, Inc. for no services. He objected that the payment had no value for Architrave.

30.

The payments made under the no-services consulting agreement were made at least in part with the intent of providing a benefit to DCIPA, Inc. and inducing its doctor-owners to "reduce outmigration" – i.e., refer their patients to Mercy Medical Center for hospital treatment, including treatment covered by Medicare and Medicaid.

31.

CEOs Morgan and Sharp were not pleased with Dr. Dannenhoffer's decision to terminate the contract. They made clear to Dr. Dannenhoffer that Architrave would need to find a replacement revenue stream to fund DCIPA, Inc.'s budget.

**B.      DCIPA, Inc. Special Services Contract**

32.

Architrave's subsidiary Umpqua Health Alliance is the Coordinated Care Organization (CCO) for Douglas County, providing health services to members of the Oregon Health Plan. As the CCO, Architrave has to make available certain medical services including sterilization and other family planning that are covered under the Oregon Health Plan.

33.

Because of Architrave's affiliation with Mercy Medical Center, which in turn is owned by Catholic Health Initiatives (CHI), Architrave was barred by CHI policy from providing medical services that are prohibited by the Ethical and Religious Directives of the Catholic Church. To address this problem, Architrave entered into a contract with a subsidiary of DCIPA, DCIPA Special Services, to provide the necessary services.

34.

Architrave negotiated the Special Services contract with DCIPA, Inc. in 2012, before Architrave began operations. At that time, the parties did not know exactly what services would have to be offered under the contract. The regional Bishop in Portland had to specify which services were barred by the Ethical and Religious Directives of the Catholic Church, and the Bishop had not yet provided that guidance.

35.

Architrave and DCIPA Special Services negotiated a payment structure whereby Architrave paid DCIPA Special Services over $1 per member per month to cover any services that might have to be provided. They agreed to review the price within the first year.

36.

When the Bishop came to a determination of the services that had to be done outside of the auspices of Architrave, it was a narrower range of services than Architrave and DCIPA, Inc. had anticipated. The actual cost to DCIPA Special Services was only six cents per member per month.  As a result, DCIPA, Inc. received an overpayment under the Special Services contract of roughly $25,000 per month.

37.

When it came time to review the contract, Dr. Dannenhoffer approached the Architrave board repeatedly about revising its terms to reflect the real cost of the services covered. Mercy CEO Morgan and DCIPA, Inc. CEO Sharp resisted. They told Dr. Dannenhoffer that they were content to allow the overpayments to DCIPA, Inc. to continue. Morgan, Sharp, and the Architrave board voted to delay reconsideration of the payment for several months.

38.

The delay in ending what Mercy and DCIPA, Inc. knew were large overpayments under the Special Services contract was motivated at least in part with the intent of providing a benefit to DCIPA, Inc. and inducing its doctor-owners to "reduce outmigration" – i.e., refer their patients to Mercy Medical Center for hospital treatment, including treatment covered by Medicare and Medicaid.

39.

Dr. Dannenhoffer raised the issue again in July, 2014 and conducted a review. That review found that between January 1, 2013 and July, 2014, Architrave had paid DCIPA Special Services approximately $450,000, while DCIPA Special Services had paid only nine claims totaling about $5,000 in medical services.

40.

Nevertheless, the overpayments continued for at least another three months until Dr. Dannenhoffer insisted they cease. The Architrave board did not take action to revise the rate paid

under the DCIPA Special Services contract to reflect commercial reasonableness until late
October, 2014.

C.     The DCIPA Physician Services (DPS) Proposal

41.

In order to replace the funding to DCIPA, Inc. lost when Dr. Dannenhoffer refused to
renew the no-services consulting contract, Architrave members Mercy and DCIPA, Inc.
proposed that Architrave could contract with a DCIPA, Inc. subsidiary, DCIPA Physician
Services (DPS), to provide various "management services" to Umpqua Medical Group (UMG),
one of Architrave's holdings previously owned by DCIPA.

42.

Dr. Dannenhoffer did not see the need for additional services for the UMG doctors, but
because Morgan and Sharp made clear that they needed some kind of deal to fund the DCIPA,
Inc. budget, he worked with them to come up with viable services that DPS might offer to
Architrave.

43.

In November 2013, an agreement was reached and terms proposed for the Architrave-
DPS arrangement. Dr. Dannenhoffer insisted that it be submitted for compliance review and had
it evaluated by outside lawyers.

44.

Within a few weeks Dr. Dannenhoffer reported to Morgan and Sharp that the contract
appeared to have significant problems with respect to compliance with the Stark law and the
Anti-Kickback Act. He cautioned that it would take time to sort through those problems. Mercy
CEO Morgan reiterated to Dr. Dannenhoffer that Architrave's members, Mercy and DCIPA,
wanted Architrave to "move forward with DPS . . . the sooner the better." [ellipsis in original].

45.

Dr. Dannenhoffer ultimately concluded that the arrangement as proposed was not viable
under the Stark law and the Anti-Kickback Act.

46.

DCIPA, Inc. CFO Chuck Chappell continued to propose work-arounds and new structures to meet the goal of transferring money from Architrave to DCIPA, Inc. None could meet the requirements of the Stark law and the Anti-Kickback Act, such as the basic requirement that the payments reflect fair market value for services rendered. By March, 2014 Architrave and DCIPA, Inc. had a significantly scaled-down proposal and sent it again to outside lawyers for review.

47.

A thorough review required scrutiny of the compensation structure for the doctors practicing at the Umpqua Medical Group (who were also member-owners of DCIPA, Inc.), who would be the beneficiaries of the management services proposed in the new contract.

48.

Lawyers for DCIPA, Inc. put up considerable resistance to an examination of the UMG doctors' pay structures. Those pay structures had been put in place in early 2010 (before Dr. Dannenhoffer was DCIPA, Inc. CEO), when DCIPA, Inc. established UMG.

49.

DCIPA, Inc. lawyers insisted that a review was not necessary because the issue had been looked at and resolved at the time of UMG's formation; that UMG did not bill any designated health services; and if they did they surely fit into an exception. They urged Dr. Dannenhoffer to have the lawyers back off.

50.

Dr. Dannenhoffer refused to back off and authorized the review to proceed.

**D.    The UMG Stark Violations**

51.

The review of UMG's compensation structures uncovered significant and long-standing violations of the Stark law. When DCIPA, Inc. leadership created UMG in 2010, they set up a compensation structure that paid doctors more every time they prescribed certain drugs and other

designated health services to Medicare patients. Allowing the doctors to profit from making those orders violated the Stark law's prohibition on doctor self-referrals.

52.

Dr. Dannenhoffer informed the Architrave board of directors of the problem. He told them that the DPS agreement had to be put on hold because the legal review had determined there was a bigger issue: a likely Stark violation that had been going on for at least four years, prior to the formation of Architrave (and prior to his tenure as DCIPA, Inc. CEO), that would require some significant restructuring of UMG to correct.

53.

Sharp and other members of the Architrave board, including UMG doctors, leveled a hailstorm of criticism. They questioned the legal advice and asked for an accounting of how much Dr. Dannenhoffer was spending on the outside lawyers. They said that Dr. Dannenhoffer was overly cautious, that UMG would lose several top doctors if it changed its compensation structure, and that Architrave was unlikely to get caught.

54.

Dr. Dannenhoffer continued to pursue the compliance issue despite the criticism.

55.

Once the review confirmed that the payments violated federal law, Dr. Dannenhoffer took steps to change the compensation arrangements of the doctors, primarily oncologists, who submitted the most improper bills to Medicare. This meant that several doctors lost a source of income that they had been receiving illegally for the past four years. Dr. Dannenhoffer also directed that all billing out of UMG for designated health services be stopped.

56.

When affected doctors could no longer profit illegally off the improper claims, many resigned from UMG. Dr. Stephen Williams, a leader in DCIPA, Inc. and member of the Architrave board of directors, was one of the oncologists whose compensation structure had to

change. He left to establish an independent practice and was among the lead board members seeking Dr. Dannenhoffer's removal from Architrave.

57.

Other members of the board continued to object as well, in hopes that Dr. Dannenhoffer would relent and agree to look the other way. Dr. Dannenhoffer stressed that now that Architrave was aware of the violations, penalties could be severe for continuing operations as they had been.

58.

On or about October 15, 2014, Dr. Dannenhoffer presented to the Architrave board of directors its options for handling the identified Stark violations.

59.

Architrave could either pay back to Medicare the entire amount of improper billings, around $10 million over four years, or it could self-report the violations to the Center for Medicare & Medicaid Services (CMS). Under CMS's self-disclosure program, health care providers submit all required information about the violation to CMS, and CMS has authority to reduce significantly the amounts owed.

60.

By this time, it was clear that Dr. Dannenhoffer would not sweep the violations under the rug. Moreover, if the Architrave board did nothing now that the issue had been identified, Architrave could be subject not only to having to pay back all of the improper billings but also be subject to a $15,000 civil penalty for each one and could lose its eligibility to participate in Medicare.

61.

The board determined it had no choice and reluctantly agreed to a self-disclosure to CMS.

62.

One of the questions Architrave had to address in the self-disclosure process was how the violations came about. Dr. Dannenhoffer authorized a forensic audit of DCIPA, Inc. emails and

records to investigate. He discovered that in 2009, when DCIPA, Inc. was creating UMG, leaders including Larry Sharp and Chuck Chappell (both board members of Architrave) had information that the compensation structure they favored for UMG could or would violate the Stark law. They went ahead with that compensation structure anyway.

63.

Dr. Dannenhoffer informed Sharp and Chappell about what he found. He let them know he wanted them to be interviewed about their memories of events.

64.

DCIPA, Inc. hired a criminal defense lawyer to advise Sharp and Chappell.

65.

Dr. Dannenhoffer took further steps to stop the Stark violations at UMG, which included negotiating new employment agreements for all UMG doctors so they could not profit off of improper referrals. Several were unhappy with the necessary changes and argued that the steps Dr. Dannenhoffer took to prevent submission of false claims were not necessary and that Dr. Dannenhoffer was too concerned with compliance with the laws against health care fraud.

66.

On or about January 28, 2015, Dr. Dannenhoffer signed and submitted to CMS a disclosure on behalf of Architrave of violations of the Stark Amendments committed by its wholly-owned subsidiary, UMG.

III.   <u>ARCHITRAVE SUMMARILY FIRES DR. DANNENHOFFER</u>

67.

Three weeks later, on February 17, 2015, Chairman of Architrave's Board of Directors Morgan and DCIPA, Inc. CEO Larry Sharp called a meeting with Dr. Dannenhoffer. Without warning, they told him that the board had decided unanimously to discharge him as CEO. They gave him no reason.

68.

Dr. Dannenhoffer had never had a performance review and never had any verbal or written warnings from the board about his management of Architrave.

69.

Dr. Dannenhoffer asked why he was being fired. He was told it was because he failed to "cooperate and coordinate."

70.

In May, 2015, Dr. Dannenhoffer was asked to serve as Interim CEO for a local federally-qualified health center, Umpqua Community Health Center (UCHC). He served successfully in that role and applied for the permanent CEO position. He was not hired.

71.

After Dr. Dannenhoffer was hired for UCHC's interim CEO position, a member of the boards of both Architrave and Mercy approached a member of the UCHC board. He said that they were very unhappy that UCHC hired Dr. Dannenhoffer and did not want UCHC to bring him on as permanent CEO. UCHC depends on Architrave to refer Oregon Health Plan patients to UCHC, and members of the UCHC board understood that Architrave might cut off this source of patients if they hired Dr. Dannenhoffer.

72.

In July, 2015, another local Roseburg health care organization, Community Health Alliance, chose not to offer Dr. Dannenhoffer a spot on its board of directors because Deborah Boswell, the Chief Nursing Officer at Mercy, made clear that Mercy would have nothing to do with any organization that Dr. Dannenhoffer was involved with.

73.

On information and belief, Architrave and its members, Mercy Medical Center and DCIPA, Inc. have told members of the Roseburg medical community that they will have nothing to do with Dr. Dannenhoffer in retaliation for his unwillingness to go along with their fraudulent

schemes and his strict compliance stance. They have threatened local entities, scuttled opportunities for him, and damaged his professional reputation in the community.

**FIRST CLAIM FOR RELIEF**
**False Claims Act – Retaliation**
**31 U.S.C.A. § 3730(h)**
**Against Architrave Health, LLC**

Plaintiff Dr. Dannenhoffer repeats and realleges paragraphs 1 - 73 above as though fully restated herein.

74.

By ending the no-services consulting contract, insisting that the overpayments under the Special Services contract cease, and reporting the Stark violations at UMG, among other actions, Dr. Dannenhoffer undertook lawful acts to stop illegal kickbacks, improper self-referrals, and one or more violations of the False Claims Act, 31 U.S.C.S. §§3729 *et seq.*

75.

By the acts described above, Architrave threatened, harassed, discharged, and otherwise discriminated against Dr. Dannenhoffer in the terms and conditions of his employment because of lawful acts he undertook to stop illegal kickbacks, improper self-referrals, and one or more violations of the False Claims Act, in violation of 31 U.S.C. § 3730(h).

76.

As a result of Architrave's unlawful retaliation, Dr. Dannenhoffer has suffered and continues to suffer lost income and benefits, loss of future earning capacity, and harm to his reputation and professional standing in amounts that are continuing to accrue and will be determined at the time of trial.

77.

As a further result of Architrave's unlawful retaliation, Dr. Dannenhoffer has suffered and continues to suffer emotional distress and loss of enjoyment of life, and other special

damages. He is entitled to compensation for these damages in an amount to be determined by the jury at trial.

78.

Because of Architrave's unlawful retaliation, Dr. Dannenhoffer has incurred attorney fees and costs and other expenses in an amount to be determined at the time of trial.

**SECOND CLAIM FOR RELIEF**
**Whistleblowing, ORS 659A.199**
**Against Architrave Health, LLC**

Plaintiff Dr. Dannenhoffer repeats and realleges paragraphs 1 - 78 above as though fully restated herein.

79.

By the acts described above, defendant Architrave threatened, harassed, discharged, and otherwise discriminated against Dr. Dannenhoffer because he in good faith reported information that he believed was evidence of a violation of federal law. In so doing, Architrave violated ORS 659A.199.

80.

As a result of Architrave's unlawful retaliation, Dr. Dannenhoffer has suffered and continues to suffer lost income and benefits, loss of future earning capacity, and harm to his reputation and professional standing in amounts that are continuing to accrue and will be determined at the time of trial.

81.

As a further result of Architrave's unlawful retaliation, Dr. Dannenhoffer has suffered and continues to suffer emotional distress and loss of enjoyment of life, and other special damages. He is entitled to compensation for these damages in an amount to be determined by the jury at trial.

82.

In taking the acts described above, Architrave acted in reckless disregard of Dr. Dannenhoffer's federally- and state-protected rights as well as the laws of the United States. Punitive damages are appropriate to punish defendant's acts and to deter such misconduct in the future.

83.

Because of Architrave's unlawful retaliation, Dr. Dannenhoffer has incurred attorney fees and costs and other expenses in an amount to be determined at the time of trial.

### THIRD CLAIM FOR RELIEF
### ORS 659.805, Blacklisting
### Against Architrave Health, LLC

Plaintiff Dr. Dannenhoffer repeats and realleges paragraphs 1 - 83 above as though fully restated herein.

84.

By the acts described above, Architrave blacklisted Dr. Dannenhoffer for the purpose of preventing him from engaging in similar or other employment, in violation of ORS 659.805.

85.

As a result of defendant's unlawful blacklisting, Dr. Dannenhoffer has lost employment opportunities, suffered and continues to suffer lost income and benefits, loss of future earning capacity, and harm to his reputation and professional standing in amounts that are continuing to accrue and will be determined at the time of trial.

86.

As a further result of defendant's unlawful blacklisting, Dr. Dannenhoffer has suffered and continues to suffer emotional distress and loss of enjoyment of life, and other special damages. He is entitled to compensation for these damages in an amount to be determined by the jury at trial.

FOURTH CLAIM FOR RELIEF
**Intentional Interference with Economic Relations**
**Against Both Defendants**

Plaintiff Dr. Dannenhoffer repeats and realleges paragraphs 1 – 86 above as though fully restated herein.

87.

By the acts described above, defendants intentionally interfered with Dr. Dannenhoffer's actual and prospective economic relations for an improper purpose and/or through improper means.

88.

As a result of defendants' unlawful interference, Dr. Dannenhoffer lost employment and beneficial business opportunities, suffered and continues to suffer lost income and benefits, loss of future earning capacity, and harm to his reputation and professional standing in amounts that are continuing to accrue and will be determined at the time of trial.

89.

As a further result of defendants' unlawful interference, Dr. Dannenhoffer has suffered and continues to suffer emotional distress and loss of enjoyment of life, and other special damages. He is entitled to compensation for these damages in an amount to be determined by the jury at trial.


**PRAYER FOR RELIEF**

**WHEREFORE**, Dr. Dannenhoffer requests that judgment be entered against defendants Architrave Health, LLC and Mercy Medical Center, Inc., ordering that:

a.      Dr. Dannenhoffer be reinstated to his position as Architrave CEO with the same seniority status that he would have had but for defendants' discrimination;

b.      Defendants Mercy and Architrave and their agents cease and desist from interfering with Dr. Dannenhoffer's work and opportunities;

c.      Dr. Dannenhoffer be awarded two times his lost compensation with interest thereon pursuant to 31 U.S.C. § 3730(h), as well as compensation for all special damages sustained as a result of defendant's retaliation;

d.      Dr. Dannenhoffer be awarded punitive damages in an amount appropriate to punish and deter similar conduct; and

e.      Dr. Dannenhoffer be awarded all costs of this action, including attorneys' fees and costs pursuant to 31 U.S.C.A. § 3730(h)(2) and ORS 659A.885.


Respectfully submitted this 26th day of January, 2016.


JOHNSON, JOHNSON & SCHALLER, PC


By: _____
     Jennifer J. Middleton, OSB # 071510
     jmiddleton@justicelawyers.com
     Meredith Holley, OSB # 125647
     mholley@justicelawyers.com
     JOHNSON, JOHNSON & SCHALLER, P.C.
     975 Oak Street, Suite 1050
     Eugene, OR 97401-3124
     Telephone:      541/683-2506
     Fax:            541/484-0882
          Attorneys for Plaintiff Robert Louis Dannenhoffer, MD