IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

ROBERT LOUIS DANNENHOFFER,
M.D.,

        Plaintiff,

vs.

ARCHITRAVE HEALTH, LLC; and
MERCY MEDICAL CENTER, INC.,

        Defendants.

No. 6:16-cv-00135-AA
OPINION AND ORDER

Jennifer J. Middleton
Meredith A. Holley
Johnson, Johnson & Schaller, PC
975 Oak Street, Suite 1050
Eugene, OR 97401
    Attorneys for plaintiff

John A. Berg
Littler Mendelson, PC
121 SW Morrison, Suite 900
Portland, OR 97204

Linda M. Doyle
Kaitlin P. Sheehan
McDermott Will & Emery LLP
227 West Monroe Street
Chicago, IL 60606

Gregory R. Jones
McDermott Will & Emery LLP
2049 Century Park East, Suite 3800
Los Angeles, CA 90067
    Attorneys for defendant
    Architrave Health, LLC

David C. Campbell
Eric J. Neiman
Lewis Brisbois Bisgaard & Smith LLP
888 SW Fifth Avenue, Suite 600
Portland, OR 97204
    Attorneys for defendant
    Mercy Medical Center, Inc.

AIKEN, Judge:

Plaintiff Robert Louis Dannenhoffer, M.D., was the Chief Executive Officer ("CEO") of defendant Architrave Health, LLC ("Architrave"). He was fired shortly after Architrave self-disclosed to the federal government that an Architrave subsidiary had submitted about $10 million in potentially illegal Medicare claims. In this action, plaintiff asserts Architrave retaliated against him for whistleblowing in violation of the False Claims Act ("FCA"), 31 U.S.C. § 3730(h), and Oregon's whistleblower protection statute, Or. Rev. Stat. § 659A.199. He further contends Architrave blacklisted him, in violation of Or. Rev. Stat. § 659.805. Finally, plaintiff avers Architrave and defendant Mercy Medical Center ("Mercy") committed the state-law tort of intentional interference with economic relations.

Defendants filed separate Answers to the Complaint on March 30, 2016. That same day, Architrave filed a Motion to Strike or in the Alternative to Dismiss (doc. 25), asking the Court to excise substantial portions of the Complaint. When plaintiff filed his response in opposition Architrave's motion, he also filed a Motion for Leave to Amend (doc. 34). For the reasons set forth

Page 2 - OPINION AND ORDER

below, Architrave's motion is denied and plaintiff's motion is granted.[1]

## BACKGROUND

The following facts are undisputed. Architrave, a limited liability corporation, was founded in 2013 in Roseberg, Oregon. Compl. ¶ 5. Architrave is a joint venture of Mercy, the nonprofit corporation that runs Roseberg's community hospital, and the Douglas County Independent Practice Association, Inc. ("DCIPA"), a corporation with more than 100 doctor-owners. *Id.* ¶¶ 5-7. Mercy and DCIPA agreed to form Architrave to "align their interests and promote access to high-quality, low-cost health care for the residents of Douglas County." *Id.* ¶ 15.

In order to form Architrave, Mercy put up $23 million in capital and DCIPA transferred to Architrave the majority of its assets, including the coordinated care organization[2] for Douglas County; a medical billing company; an electronic health records management company; a primary-case health center; and a one-third interest in a Medicare Advantage plan. *Id.* ¶ 16. A portion of

---

[1] Architrave filed a reply brief in support of its motion to strike. Doc. 36. In the District of Oregon, replies to motions to strike are permitted only with leave of the court. *See* L.R. 56-1(b); Practice Tip to L.R. 7-1(e)(2). Even if a reply had been permitted, Architrave's reply would not have been timely, as it was filed more than fourteen days after plaintiff filed his response. *See* L.R. 7-1(e)(2).

[2] Coordinated care organizations ("CCOs") are "the umbrella organizations that govern and administer care for [Oregon Health Plan (Medicaid)] members in their local communities. . . . They . . . have one budget that grows at a fixed rate for mental, physical and ultimately dental care. CCOs will bring forward new models of care that are patient-centered and team-focused." Oregon Health Authority, About Coordinated Care Organizations, https://cco.health.oregon.gov/Pages/AboutUs.aspx (last accessed May 11, 2016). After the Affordable Care Act was enacted in 2010, Oregon obtained "waiver" authorization from the Centers for Medicare and Medicaid Services ("CMS") to establish CCOs as the care and coverage delivery system for Medicaid. Oregon Health Policy Board, Oregon's Medicaid Demonstration, www.oregon.gov/oha/OHPB/Pages/health-reform/cms-waiver.aspx (last accessed May 11, 2016).

Page 3 - OPINION AND ORDER

Mercy's $23 million capital investment was used in pay dividends to DCIPA's doctor-members in exchange for this transfer of assets. *Id.* ¶ 16. Plaintiff was CEO of DCIPA when Architrave was formed, and he became the first CEO of Architrave when it began operations. *Id.* ¶ 17. As CEO, plaintiff was accountable to Architrave's board of directors, which was composed of five DCIPA representatives and five Mercy representatives. *Id.* ¶ 18.

From its inception, Architrave contracted with DCIPA to provide certain services. For the first year of its operation, Architrave paid DCIPA a $30,000 monthly fee for consulting services ("consulting services contract"). *Id.* ¶ 25. Architrave also paid a subsidiary of DCIPA a flat per-member monthly fee for "special services" — clinical services such as sterilization and family planning that Mercy, as a Catholic hospital, could not provide ("special services contract"). *Id.* ¶¶ 32-34. During plaintiff's tenure as CEO, Architrave attempted to negotiate a management services contract with a different DPICA subsidiary ("management services contract"). *Id.* ¶¶ 42-43, 46. After legal review of one of the proposed management services contracts, Architrave, through plaintiff, self-disclosed $10 million in potentially illegal Medicare claims to CMS. *Id.* ¶¶ 59, 61, 66. Architrave terminated plaintiff's employment about three weeks after that disclosure. *Id.* ¶ 67.

The parties' versions of the story diverge dramatically with respect to the reasons for plaintiff's termination and the sequence of events involving the contracts with DCIPA. It is undisputed that one of the goals of Architrave was to reduce "outmigration" of cases. *Id.* ¶ 21; Answer ¶ 21. "Outmigration" is the movement of a patient to a healthcare provider outside of Roseberg — for example, through a referral to a hospital in the larger nearby city of Eugene rather than to Mercy. Plaintiff asserts Architrave's board members considered it vital to develop "some kind of deal to fund the DCIPA," which had lost major revenue streams when it transferred its assets

Page 4 - OPINION AND ORDER

to Architrave, so that DCIPA's doctor-members would keep their referrals in Roseberg. Compl. ¶ 24, 42. He further alleges Architrave's contracts with DCIPA and its subsidiaries were all designed, at least in part, to "secure the cooperation" of DCIPA in sending a steady stream of patient referrals to Mercy and other Architrave providers. *Id.* ¶¶ 24, 30, 38. Plaintiff asserts Architrave achieved this goal by paying DCIPA for services it never delivered (in the case of the consulting services contract) and by paying significantly more than fair market value for services rendered (in the case of the special services contract.) *Id.* ¶¶ 28, 36-37.

Plaintiff contends that he insisted on a legal review of the management services contract, which "uncovered significant and long-standing violations of [federal] law" governing Medicare claims. *Id.* ¶ 51. He alleges that, in the face of a "hailstorm of criticism" from Architrave board members, he continued to investigate these legal violations. *Id.* ¶¶ 53, 54. Plaintiff contends he was the driving force behind self-reporting and that the board only "reluctantly" agreed to disclose the violations to CMS. *Id.* ¶ 61. He alleges he was fired, and that defendants blocked him from obtaining employment elsewhere, because of his "strict compliance stance" and "unwillingness to go along with [defendants'] fraudulent schemes." *Id.* ¶ 73.

Unsurprisingly, Architrave's version of the facts is quite different. It denies the DCIPA contracts were motivated by a desire to boost referrals. Answer ¶¶ 24, 30, 38. Instead, Architrave argues the DCIPA contracts were intended to further "multiple important and legitimate business purposes," including "to harness DCIPA['s] substantial expertise, abilities, relationships, and other attributes useful to further development of the medical community and the provision of healthcare services." *Id.* ¶¶ 24, 30 (quotation marks omitted). Architrave also denies it paid for services never rendered under the consulting contract, and contends the apparent overpayment under the special

Page 5 - OPINION AND ORDER

services contract was due to coding problems, *viz.*, the computer system did not permit providers to bill for the full amount of services rendered. *Id.* ¶¶ 28, 36. Once the coding problems were adequately addressed, Architrave asserts the amount paid under the special services contract fairly approximated the value of the DCIPA subsidiary's services. *Id.* ¶ 36. Architrave contends plaintiff was not fired because of any attempt to stop legal violations, but instead due to "significant issues related to his performance . . . , his leadership style (including his inability to work collaboratively), his extreme negative response to any criticism or disagreement (including angry outbursts), his failure to respond to the board's directives, his constant misleading of the board, his alienating and angering of physicians, his mismanagement of personnel, and his management and selection of a new practice management system . . . which . . . ended up costing Architrave more than $4 million." *Id.* ¶ 68.

## DISCUSSION

### I. *Motion to Strike*

The focus of Architrave's motion to strike is paragraphs 25 to 40 and portions of paragraph 74 in the Complaint. These sections are devoted to factual allegations related to the consulting services contract and the special services contract. Architrave argues these allegations should be stricken as immaterial and impertinent.

A court may "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter" either "on its own" or "on motion made by either party . . . before responding to the pleading." Fed. R. Civ. P. 12(f). An immaterial matter is "that which has no essential or important relationship to the claim for relief or the defenses being pleaded." *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir. 1993) (citation and quotation marks omitted), *rev'd*

*on other grounds*, *Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994). Impertinent material "consists of statements that do not pertain, and are not necessary, to the issues in question." *Id.* at 1527. "One test that has been advanced for determining whether an allegation in a pleading is immaterial and impertinent within the meaning of 12(f) is whether proof concerning it could be received at trial; if it could not, then the matter is immaterial and impertinent." *Pratt v. Phoenix Home Life Mut. Ins. Co.*, 285 B.R. 3, 6 (D. Or. 2001) (quoting 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1382 (2d ed. 1990)).

Citing Rule 12(f)'s directive that a motion to strike must be made "before responding to the pleading," plaintiff challenges Architrive's motion as untimely. The Ninth Circuit has interpreted Rule 12(f) to prohibit a district court from striking portions of a pleading in response to a motion filed *after* the moving party has already filed a responsive pleading. *Culinary & Serv. Emps. Union, AFL-CIO Local 555 v. Haw. Emp. Benefits Admin., Inc.*, 688 F.2d 1228, 1232 (9th Cir. 1982). Here, however, the motion to strike was filed *at the same time* as Architrive's Answer. *See* Doc. 25, 26. The Ninth Circuit has not addressed whether a district court is time-barred from considering a motion to strike when the motion is filed together with the responsive pleading, and lower courts are split on the issue. *Compare Winnemem Wintu Tribe v. U.S. Forest Serv.*, 2013 WL 1325423, *4 (E.D. Cal. Mar. 29, 2013) (interpreting *Culinary* to mean a motion to strike is timely only if it "precede[s] the filing of a responsive pleading") *with Nkemakolam v. St. John's Military Sch.*, 876 F. Supp. 2d 1240, 1246 (D. Kan. 2012) (motion to strike is timely when filed "simultaneous[ly]" with answer). However, it is unnecessary to resolve this question. Even if the motion is timely, it must be denied. The challenged allegations are neither immaterial nor impertinent, as evidence about the consulting services contract and the special services contract (collectively, "the DCIPA

Page 7 - OPINION AND ORDER

contracts") would be relevant at trial.

Before addressing Architrive's arguments, it is necessary to explain the federal laws that form the backdrop of plaintiff's claims. Plaintiff alleges he was concerned about violations of three federal laws: the Stark Act, 42 U.S.C. § 1395nn; the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b); and the FCA, 31 U.S.C. § 3729. The Stark Act "generally prohibits a physician from referring Medicare patients to entities in which the physician has a prohibited 'financial interest.'" *Ebeid ex rel. U.S. v. Lungwitz*, 616 F.3d 993, 1000 (9th Cir. 2010) (quoting 42 U.S.C. § 1395nn). The AKS makes it a crime to knowingly and willfully exchange money for referral of Medicare patients. *United States v. Ctr. for Diagnostic Imaging, Inc.*, 787 F. Supp. 2d 1213, 1217-18 (W.D. Wash. 2011).

The FCA broadly combats fraud on the government by "encourag[ing] insiders to disclose fraud." *Ebeid*, 616 F.3d at 995. It "contains a *qui tam* provision that permits private persons (known as 'relators') to bring civil actions on behalf of the United States" against individuals or entities who violate its terms. *Id.* As part of submitting Medicare claims to the federal government for payment, the submitting individual or entity must certify compliance with a variety of federal laws, including the Stark Law and the AKS. *See U.S. ex rel. Brooks v. Trillium Cmty. Health Plan*, 2016 WL 1725300, *6 (D. Or. Apr. 29, 2016). Accordingly, in the healthcare context, an FCA violation often takes the form of a false certification of compliance with the Stark Law and the AKS. *Id.*

Plaintiff's first claim for relief is a claim under the FCA's whistleblower protection provision, 31 U.S.C. § 3730(h). To succeed on such a claim, a plaintiff must show "(1) that the employee engaged in activity protected under the statute; (2) that the employer knew that the employee engaged in protected activity; and (3) that the employer discriminated against the

Page 8 - OPINION AND ORDER

employee because she engaged in protected activity." *Moore v. Cal. Inst. of Tech. Jet Propulsion Lab.*, 275 F.3d 838, 845 (9th Cir. 2002). "Protected activity" includes any "lawful act . . . done . . . in furtherance of an action" under the FCA. 31 U.S.C. § 3730(h)(1). It also encompasses "efforts to stop 1 or more violations of this subchapter." *Id.* As relevant here, that means "protected activity" encompasses efforts to stop false certifications to the government regarding compliance with the Stark Law and the AKS.

Architrave argues the allegations about the DCIPA contracts are immaterial and impertinent to his FCA retaliation claim because plaintiff has failed to identify any "protected activity" in connection with those contracts. I disagree.[3] Plaintiff asserts he opposed the contracts with DCIPA, and eventually refused to renew those contracts, because of his concern the agreements violated the AKS.[4] A CEO's internal opposition to and eventual decision not to renew contracts because of a sincere, reasonable belief those contracts violated the AKS plainly qualifies as an effort to stop an

---

[3] Even if the DCIPA allegations did not themselves contain allegations of protected activity, striking them would be improper. These allegations provide context and background for (1) Architrave's self-report to federal officials about Stark Law violations; and (2) plaintiff's purported internal efforts to restructure Architrave's compensation schemes and contractual relationships to eliminate violations of the Stark Law and the AKS. For example, the DCIPA allegations could be used to prove board member knowledge of the alleged pattern of legal violations and plaintiff's purported attempts to stop those violations. That knowledge, in turn, would be a relevant consideration in determining Architrave's motivation in firing plaintiff. *See* Fed. R. Evid. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.")

[4] I agree with Architrave the Complaint could be clearer regarding plaintiff's belief the agreements violated federal law. However, that argument goes to adequacy of the pleadings, not to materiality and pertinence on a motion to strike. As explained in Section II of this Opinion, Architrave has not made a proper challenge to the pleadings under either Rule 12(b)(6) or Rule 12(c) because it has not asked the Court to dismiss any of plaintiff's claims.

Page 9 - OPINION AND ORDER

FCA violation.[5]

Architrave argues plaintiff's opposition to the DCIPA contracts was not protected activity because he was simply carrying out his normal job duties as CEO. In support of this argument, Architrave cites a number of out-of-circuit authorities holding actions do not constitute "protected activity" if the employee was "required to undertake [them] in fulfillment of . . . job duties." *E.g. U.S. ex. rel. Ramseyer v. Century Healthcare Corp.*, 90 F.3d 1514, 1523 (10th Cir. 1996). This line of cases is inapplicable here because the decisions interpreted a predecessor version of section 3730(h). Before 2009, FCA retaliation protection was confined to individuals who had done something "in furtherance of an action" under the FCA. Because of the statute required a "nexus" between the employee's activity and a claim under the FCA, many courts held employees had to show they had gone beyond the usual scope of their job duties in investigating or reporting the fraud. *E.g. Robertson v. Bell Helicopter Textron, Inc.*, 32 F.3d 948, 951-52 (5th Cir. 1994). Defendant contends these cases stand for the proposition that employees whose job descriptions encompass ensuring the company operates within the bounds of the law face a heightened burden to prove their investigation of fraudulent activity was connected to a potential FCA violation, and was not simply part of their normal job duties. *E.g. Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176, 191 (3d

---

[5] In ruling on a motion to strike, a district court may not resolve "disputed and substantial factual or legal issues." *Whittlestone*, 618 F.3d at 973. Accordingly, it is premature to determine whether plaintiff's belief the contracts violated the Anti-Kickback Statute was objectively reasonable or subjectively genuine. It is similarly premature to determine whether his decision not to renew the contracts was based on such a belief, *i.e.*, whether that decision was an effort to stop FCA violations rather than a pure attempt to improve Architrave's financial situation. Today, the Court decides only that *if* plaintiff's belief was reasonable and sincere, and *if* that belief motivated him to oppose the contracts, then plaintiff engaged in qualifying protected activity under section 3730(h).

Page 10 - OPINION AND ORDER

Cir. 2001).

In 2009, Congress amended section 3730(h) to add whistleblower protections for employees who attempted to *stop* violations of the FCA, whether or not those efforts were connected to a potential FCA claim. *Halasa v. ITT Educ. Servs., Inc.*, 690 F.3d 844, 847-48 (7th Cir. 2012). Applying old case law rooted in the requirement there be a connection between an FCA claim and the employee's actions would contravene the plain text of the statute.[6] *See U.S. ex rel. McGinnis v. OSF Healthcare System*, 2014 WL 378644, *9 (C.D. Ill. Jan. 31, 2014) (explaining there is no "nexus" requirement to prove "protected activity" in the form of "other efforts to stop violations of the FCA").

The factual allegations in paragraphs 25 to 40 and 74 are neither impertinent nor immaterial. Architrave's motion to strike is denied.

---

[6] The "scope of duties" cases also tended to collapse into a single inquiry whether an employee engaged in protected activity and whether the employer was aware of the protected activity. *See Hutchins*, 253 F.3d at 193 (stating there is a heightened burden for each prong when the protected activity and scope of employment duties overlap, but focusing on whether a memorandum "inform[ed]" the employer "that [the employee] intended to use th[e] information in furtherance of a *qui tam* action"); *Ramseyer*, 90 F.3d at 1523 (discussing both prongs but failing to separate analysis of the two prongs); *Robertson*, 32 F.3d at 951-52 (same). In *Ramseyer* and *Robertson*, the ultimate holding dooming the employee's claim was not that the employee failed to show protected activity, but that the employer could not have been expected to know about the protected activity because that activity overlapped with the employee's usual duties. *See Ramseyer*, 90 F.3d at 1523 ("[W]e do not believe plaintiff has satisfied her burden of pleading facts which would put defendants on notice that she was taking any action in furtherance of an FCA action."); *Robertson*, 32 F.3d at 952 ("We therefore conclude that Robertson failed to present sufficient evidence to support a finding that Bell was aware that his investigations were in furtherance of a *qui tam* action.") *But see Hutchins*, 253 F.3d at 195 ("By failing to prove that he engaged in 'protected conduct' and that he put his employer on notice of the 'distinct possibility' of False Claims Act litigation, Hutchins, as a matter of law, cannot prove a violation of § 3730(h).") Arguably, this line of cases applies primarily to the employee's evidentiary burden regarding employer knowledge.

Page 11 - OPINION AND ORDER

II.   *Motion to Dismiss*

In the alternative, Architrave argues paragraphs 25 to 40 and portions of paragraph 74 should be dismissed under Fed. R. Civ. P. 12(b)(6).[7] The relief Architrave requests is not available pursuant to a motion to dismiss for failure to state a claim. Rule 12(b)(6) permits a party to challenge the sufficiency of a *claim*; it is not a vehicle for striking isolated factual allegations. *Cf. Whittlestone*, 618 F.3d at 974 (explaining the difference between Rules 12(b)(6) and 12(f), and refusing to "creat[e] redundancies within the Federal Rules of Civil Procedure" by dismissing a claim as legally insufficient in response to a 12(f) motion to strike). Because Architrave has not asked the Court to dismiss any of plaintiff's *claims*, its alternate request for dismissal under Rule 12(b)(6) is denied without prejudice to renewal of the arguments therein in a future motion.

III.   *Motion for Leave to Amend*

Plaintiff seeks leave to amend the complaint.[8] Architrave opposes amendment on the ground

---

[7] Plaintiff asserts the 12(b)(6) motion is time-barred. Rule 12(b) provides that a motion to dismiss for failure to state a claim "must be made *before* pleading if a responsive pleading is allowed." Fed. R. Civ. P. 12(b) (emphasis added). Again, this raises the question whether a motion filed together with the Answer qualifies as being filed "before" the responsive pleading. *Id.* Whatever the answer to that question, timeliness is not bar to this Court's consideration of Architrave's 12(b)(6) motion. Courts regularly construe motions to dismiss for failure to state a claim filed after a responsive pleading as motions for judgment on the pleadings pursuant to Rule 12(c). *Elvig v. Calvin Presbyterian Church*, 375 F.3d 951, 954 (9th Cir. 2004). Rule 12(b)(6) and Rule 12(c) are "functionally identical" and "the same standard of review applies to motions brought under either rule." *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054 n.4 (9th Cir. 2011) (quotation marks omitted).

[8] Plaintiff moved to amend "in an abundance of caution . . . should this Court feel that additional allegations are necessary." Pl.'s Mot. Leave Amend 2. As explained, the Court will not address Architrave's arguments regarding dismissal of certain portions of the Complaint, as Rule 12(b)(6) is a vehicle for dismissal of claims, not factual allegations. Nonetheless, in the interest of efficiency, the Court addresses plaintiff's request for leave to amend.

of futility. A party seeking to amend its pleading after the time to amend as a matter of course has expired must obtain leave of the court. Fed. R. Civ. P. 15(a)(2). Leave to amend "should be freely given when justice so requires because the purpose of the rule is to facilitate decision on the merits, rather than on the pleadings or technicalities." *Novak v. United States*, 795 F.3d 1012, 1020 (9th Cir. 2015) (alterations normalized and quotation marks omitted). However, a court need not grant leave to amend if amendment would be "an exercise in futility." *Id.*

Plaintiff seeks to add three allegations to the complaint: that the ACIPA contracts likely violated the AKS; that plaintiff subjectively believed the contracts violated the AKS; and that Architrave knew when it discharged plaintiff that his opposition to and decisions not to renew the ACIPA contracts were efforts to stop potential violations of the FCA. Architrave argues such amendments would be futile on two grounds. First, Architrave asserts plaintiff has "already conceded" the allegations about the ACIPA contracts are immaterial to his retaliation claims. Architrave Resp. Pl.'s Mot. Leave Amend 3. The Court finds no such "concession" anywhere in plaintiff's filings. Moreover, as explained, the Court finds the ACIPA allegations both material and pertinent. Second, Architrave argues plaintiff's amendments amount to affirmative allegations that he committed a federal felony, and that his signature on the ACIPA contracts means he bears responsibility for any legal violations. That argument is well beyond the scope of a motion to amend and most likely cannot be resolved until summary judgment or trial.

Plaintiff's proposed additions are directly responsive to the Architrave's arguments regarding purported pleading deficiencies. Amendment would not be futile. Accordingly, plaintiff's motion for leave to amend is granted.

CONCLUSION

Architrave's Motion to Strike or in the Alternative to Dismiss (doc. 25) is DENIED. Architrave's request for oral argument is DENIED as unnecessary. Plaintiff's Motion for Leave to Amend (doc. 34) is GRANTED.

IT IS SO ORDERED.

Dated this 25th day of May 2016.

*/s/ Ann Aiken*
Ann Aiken
United States District Judge